Argued at Pendleton October 31; affirmed November 28, 1933

## HALL *v.* MARSHALL ET AL.
### (27 P. (2d) 193)

*Jay H. Upton,* of Bend (A. M. Hodler, of Portland, on the brief), for appellant.

*C. B. Phillips,* of Burns (H. V. Schmalz, of Burns, on the brief), for respondents.

RAND, C. J. This is a suit in equity to foreclose two chattel mortgages given to the First National

Bank of Burns, which is now insolvent, to secure notes severally owing to the bank by the defendants, Ben Campbell, Jr., and Ray Marshall, each mortgaging his own band of sheep. Subsequently, Campbell sold and delivered his band of sheep to Ray Marshall and thereafter the two bands were united and run as one band and were at the time of the commencement of this suit so commingled that those owned by one mortgagor at the time the mortgage was given could not be distinguished from those owned by the other mortgagor.

The prayer of the complaint was that that question be determined and the proper credit be given upon the two mortgages. No objection was made to the form in which the complaint was drawn and, since neither Campbell nor Marshall has appealed from the decree, that question is not here for determination.

The notes and mortgages were transferred and assigned by the bank to the Reconstruction Finance Corporation and, for the purposes of foreclosure and collection, had been reassigned to the plaintiff, the receiver of the bank as trustee. All the defendants were duly served with process and, with the exception of the defendants, Elmer, William and Sam Dunn, all the defendants defaulted.

William and Sam Dunn filed a joint answer, merely denying the allegations of the complaint and, since they had no interest in the matters in controversy, no decree against them was taken. Elmer Dunn filed a separate answer in which he set up as a defense that he had a prior lien upon the sheep for their care and keep, growing out of a distraint made by him of the sheep while doing damage upon premises in his possession, and also that he had an agister's lien for the feeding and care of the sheep during the winter of

1932-1933. The complaint also alleged a conversion by Elmer Dunn of the sheep and prayed damages against him for such conversion.

At the conclusion of the trial, the learned trial court entered a decree, decreeing that the defendant Elmer Dunn had a first lien upon the sheep for the sum of $800 and foreclosing the mortgages and directing that the sheep be sold and, out of the proceeds realized therefrom, that Dunn be first paid said sum together with his costs, and that the remainder be applied in satisfaction of the mortgages and the balance, if any, be paid over to the defendant Ray Marshall, the owner of the sheep. From this decree, plaintiff has appealed.

It appears from the evidence that Elmer Dunn at the time of the trespass hereinafter referred to had a leasehold estate in a section of land on Jack creek, Harney county, Oregon; that the land is situate on the desert and has living water on it, and that for a distance of some twenty miles there is no other water available to stock for drinking purposes; that the land was enclosed with a lawful fence in good condition, being partly enclosed by a fence and partly by rimrock; that Dunn owned a band of cattle and used the land in the spring as pasturage; that Ray Marshall, the owner of the sheep, had full knowledge of Dunn's possessory rights to the land and of the uses which he was making of the land; that on or about the 20th day of September, 1932, Marshall drove his band of sheep to the Dunn place and left the same there in charge of his herder, knowing that the sheep could not obtain water unless driven on the enclosed land into the running water thereon, and that the sheep remained there in charge of the herder and were watered on the

premises and ate and destroyed the pasturage growing thereon, up to the 8th day of October, 1932, at which time Elmer Dunn, having been informed that the sheep were on his premises, went to the place, took the sheep into his custody, claiming a right to hold the same for the damages done to his place by the sheep.

The evidence further shows that the Dunn premises were in part fenced by posts and wire and that the wire had been taken down so as to permit the sheep to enter the premises; that Marshall returned to the sheep on the same day and shortly after Dunn had taken them as a distress and while the sheep were still on Dunn's land. The defendant offered to surrender the sheep to Marshall upon Marshall's paying him for the damage, Dunn claiming that he had been damaged in the sum of $400. Marshall refused to make settlement for the damage and went away, leaving the sheep in Dunn's possession. Dunn kept the sheep, watering and feeding them for several weeks and until the pasturage and feed were exhausted. He then drove the sheep to his own ranch and kept them there, feeding them with hay until on or about the 8th day of April, 1933, at which time by an agreement entered into by the parties, Dunn surrendered the sheep to the sheriff of Harney county under a stipulation that the sheep should be sold and the proceeds placed in the hands of the clerk of the court to be paid out according to the decree entered in the suit.

After taking the sheep into his custody, Dunn caused a written notice to be prepared and served by the sheriff upon plaintiff and also upon the defendant, Ray Marshall, notifying them that he was holding the sheep for the damage done to his premises and offering to make settlement for the amount he

claimed as damages and that, if that was not satisfactory to plaintiff and Marshall, to arbitrate the matter with them and have the question of damage determined by some disinterested parties. Neither plaintiff nor Marshall paid any attention to the notice or offered to make any settlement for the damage, permitting the sheep to remain in the possession of Dunn, knowing that he would be compelled to provide feed for them during the coming winter.

Under these facts, the court determined that Dunn was entitled to a lien upon the sheep in caring for and feeding them between the 20th of October, 1932, and the 8th day of April, 1933, when the sheep were surrendered to the sheriff.

■ Plaintiff contends that the sheep are not subject to distraint for damages done to real property under the laws of this state. He bases his contention upon section 38-108, Oregon Code 1930, which, in substance, provides that no action shall be maintained for damages done by the animals enumerated therein upon the premises of another unless the person seeking such damage shall allege and prove that at the time of the commission of the damage the premises were enclosed with a lawful fence, except where the premises are situate within an incorporated city, town or village, or in a place where the animals are prohibited by law from running at large, or where the owner of the premises is not required to fence against such animals, and section 38-113, Oregon Code 1930, which, in substance, provides that any person sustaining damage by any animal mentioned in section 38-108, whose premises are enclosed with a lawful fence may recover the damages in an action before any court having jurisdiction and that the trespassing animals may be taken

and held as security for the payment of such damage and cost. Neither of said sections contains any reference or makes any mention of sheep. The last section gives to the person taking possession of the animals specifically mentioned in the former section a lien on such animals for their care, food and water, and provides the manner in which the owner of the animals shall be notified. Both of these sections are made applicable to Harney county by section 38-114.

Neither of the above-mentioned sections has any application to this case for the reason that the evidence tends to show that these premises were enclosed with a lawful fence and also neither statute has any reference to trespassing upon real property by sheep.

Section 51-402, Oregon Code 1930, provides that:

"* * * any person who shall depasture or feed any horses, cattle, hogs, sheep or other livestock, or bestow any labor, care or attention upon the same at the request of the owner or lawful possessor thereof, shall have a lien upon such property for his just and reasonable charges for the labor, care and attention he has bestowed, and the food he has furnished, and he may retain possession of such property until such charges be paid; and the lien hereby created shall have preference over any and all other liens or encumbrances upon such * * * animals, except any lien for herding animals."

■ Plaintiff contends that because sheep are not mentioned in section 38-108 and because the remedy of distress is given by section 38-113 for only such animals as are mentioned in section 38-108, and sheep not being so mentioned, the remedy of distress does not exist for sheep trespassing upon real property and that if the common law remedy does exist, then, under the common law rules, the security conferred by the taking of the animals in distress is for the damage

done by the animals only and not for the expenses incurred in the care and feeding of the distrained animals.

We do not think that the statute referred to was intended to limit the remedy of distress damage feasant only to the animals enumerated in the statute. ''A distress'', it is said, ''is the taking of a personal chattel without legal process from the possession of a wrongdoer into the hands of the party aggrieved, as a pledge for the redress of an injury, the performance of a duty, or the satisfaction of a demand.'' Bradby on Distress 1. It is said to be founded on the instinct and principle of self-help. 3 Street, Foundations of Legal Liability, p. 278. This author says on page 309:

''If cattle or other things, animate or inanimate, be on the land of any other person than their owner, encumbering the land or otherwise doing injury thereto, they may be distrained and held until compensation be made for the injury.''

On page 312, he says:

''Finally, it is to be remarked that the right to distrain damage feasant is not restricted to living things.''

Whether the principles of the common law, giving the remedy of distress of things damage feasant, if applied other than to beasts taken damage feasant is adapted to conditions existing in this state, is a question which we are not now called upon to decide. But they are applicable to beasts doing damage on the lands possessed by another and we think that section 38-108 is not intended to take away the right of taking sheep damage feasant as well as the animals specifi-

cally mentioned therein. This seems to follow from the provisions of section 1-810, Oregon Code 1930, which was enacted by the legislature of this state in 1862, and has never been amended or repealed. It provides:

"In an action to recover the possession of property, distrained doing damage, an answer that the defendant or person by whose command he acted was lawfully possessed of the real property upon which the distress was made, and that the property distrained was at the time doing damage thereon, shall be good without setting forth the title to such real property."

In the enactment of this section it is plain that the legislature was of the opinion that the principles of the common law granting to the owner or possessor of lands the right to distrain animals doing damage on the lands is adapted to our conditions and hence should become a part of the body of the law of this state for that reason and, it being the law, the reason for its application to sheep doing damage is as strong as if it were some other kind of animals taken damage feasant.

In *Bileu v. Paisley,* 18 Or. 47 (21 P. 934, 4 L. R. A. 840), Mr. Justice THAYER, speaking for the court, quoted with approval from Blackstone as follows:

"A man is answerable for not only his own trespass, but that of his cattle also; for if, by his negligent keeping, they stray upon the land of another (and much more if he permits or drives them on), and they there tread down his neighbor's herbage, and spoil his corn or his trees, this is a trespass for which the owner must answer in damages; and the law gives the party injured a double remedy in this case, by permitting him to distrain the cattle, thus damage feasant or doing damage, till the owner shall make him satisfaction; or else by leaving him to the common remedy in foro contentioso, by action."

The word "cattle" is defined by Bouvier as "a collective name for domestic quadrupeds generally, including not only the bovine tribe, but horses, asses, mules, sheep, goats, and swine. Web. Dict.; 21 Wall. 299".

In the Bileu case, in considering the purpose and effect of the 1872 act, to a part of which we have referred, the court said:

"* * * A person owning and occupying land is not vested with the right to enjoy it upon condition that he inclose it by a palisade strong enough to keep his neighbors and their stock from breaking into and destroying the fruits of his labors. Property is not held in civilized communities by so insecure a tenure; but the law surrounds it by an ideal, invisible palladium, more potent than any mechanical paling that can be constructed. The rule in question did not require to be adopted in order to be in force. It always exists where the right of private dominion over things real is recognized. It pertains to ownership. The legislature, in the exercise of the police power of the State, may, no doubt, require the owners of lands to fence them in a certain manner, and in default thereof to withhold from them a remedy for a trespass committed thereon by animals running at large. In a sparsely-populated section of country, where there are extensive open commons, and stockraising is an important industry, it might be judicious to adopt such a regulation; but to hold that one man has a right to permit his stock to go upon the lands of another, if not protected by a material inclosure, would be holding, in effect, that a man did not own what belonged to him. The legislature cannot legalize such a trespass. It cannot provide that the cattle of A may lawfully go upon the land of B against the latter's consent, whether his land is fenced or unfenced; though it may, as before suggested, withhold from B a remedy for damages occasioned by such a trespass, if his land is not in-

closed in a prescribed manner. Legislation of the character referred to goes only to the remedy, and no attempt to extend it further could be justified."

■ Plaintiff's contention that where a distress is taken, the distrainer at common law had no lien or claim upon the distrained animals for the food necessary to sustain them, we think is not well taken in this case. The rule at common law applicable thereto is stated by Blackstone, 3 Comm., p. *13, as follows:

"* * * If a live distress of animals be impounded in a common pound-overt, the owner must take notice of it at his peril; but if in any special pound-overt, so constituted for this particular purpose, the distrainor must give notice to the owner; and in both these cases the owner, and not the distrainor, is bound to provide the beasts with food and necessaries. But if they are put in a pound-overt, in a stable, or the like, the landlord or distrainor must feed and sustain them. (Citing in support thereof, Co. Litt. 47.)"

The rule upon this question is stated in the note, 26 A. L. R., p. 1048, as follows:

"Where cattle are distrained damage feasant it is generally held that a lien for their keep, or the charges incident to the distress, or for both, attaches thereto."

Numerous cases are cited in support thereof.

As proven in the case at bar, these sheep were distrained on a desert ranch in Harney county where no other stock water was obtainable for a distance of about twenty miles and, being in the custody of Dunn, he was obliged to feed and water them, for otherwise they would have died. And when the feed was exhausted at that point, he was compelled to move them to his home ranch in Harney valley, a distance of some thirty or forty miles, and there feed them during that

winter. He had given notice to the owner of the sheep and to the receiver of the bank of his claim to the sheep and of his willingness, upon settlement thereof, to surrender possession of them either to the owner or to the receiver. They paid no attention whatever to his notice and left him with the burden of caring for these sheep throughout that winter. Plaintiff now comes into a court of equity, seeking its aid to foreclose these mortgages, without being willing himself to do equity upon his part. It certainly would be very inequitable if Dunn should be compelled to bear this entire expense incurred in good faith by him for the preservation of the mortgaged property. For these reasons, we think that the action of the court below in granting to Dunn a first lien upon the proceeds to be realized from the sale of the sheep was equitable and just, and, for that reason, that the decree should be affirmed. It is so ordered.

CAMPBELL and BAILEY, JJ., not sitting.